UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

EDDIE MOORE, JR.,                    )
                                     )
        Plaintiff,                   )
                                     )
    vs.                              )        Case No. 4:12CV2170ERW(LMB)
                                     )
CAROLYN W. COLVIN,                   )
Acting Commissioner of Social Security, )
                                     )
        Defendant.                   )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Eddie Moore, Jr. for Supplemental Security Income under Title XVI of

the Social Security Act.  The cause was referred to the undersigned United States Magistrate

Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b).  Plaintiff filed a Brief

in support of the Complaint.  (Doc. No. 12).  Defendant filed a Brief in Support of the Answer.

(Doc. No. 17).  Plaintiff has filed a Reply.  (Doc. No. 18).

## Procedural History

On October 7, 2009, plaintiff filed his application for benefits, claiming that he became

unable to work due to his disabling condition on January 1, 2008.  (Tr. 122-27).  This claim was

denied initially, and following an administrative hearing, plaintiff's claim was denied in a written

opinion by an Administrative Law Judge (ALJ), dated May 20, 2011.  (Tr. 65, 46-56).  Plaintiff

then filed a request for review of the ALJ's decision with the Appeals Council of the Social

Security Administration (SSA), which was denied on September 28, 2012. (Tr. 9, 1-8). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on March 1, 2011. (Tr. 12). Plaintiff was present and was represented by counsel. (Id.). Also present was vocational expert Michael McKeeman. (Id.).

Plaintiff's attorney examined plaintiff, who testified that he was forty-five years of age, and lived in an apartment with a roommate. (Tr. 14-15). Plaintiff stated that he was single, and had three children. (Tr. 15). Plaintiff testified that his children did not live with him. (Id.).

Plaintiff stated that he has never had a driver's license because he is unable to read the test. (Tr. 16).

Plaintiff testified that he graduated from high school, and that he took all special education classes since the first grade. (Id.). Plaintiff stated that he was "slower than the other children" in school, and that it took him longer to learn. (Id.). Plaintiff testified that he is unable to spell words, and he is only able to write words by copying letters. (Id.).

Plaintiff stated that he is able to perform simple mathematics, such as adding and counting change. (Id.).

Plaintiff testified that he is ineligible to receive food stamps due to having a felony on his record. (Tr. 17). Plaintiff stated that he has a felony conviction for drug possession, for which he is currently on parole until February of 2016. (Id.). Plaintiff testified that he served six-and-a-half

years in prison, and that he was released in February of 2008. (Id.). Plaintiff stated that he also served time in the penitentiary from 2000 to 2002 for a drug possession charge. (Tr. 17-18).

Plaintiff testified that he had a problem with cocaine, marijuana, and alcohol in the past. (Tr. 18). Plaintiff stated that he has not consumed alcohol since his release from prison. (Id.). Plaintiff testified that he used marijuana shortly after his release from prison, but he was "caught" when he tested positive for marijuana. (Tr. 19). Plaintiff stated that he has not used any illegal substances since 2009. (Id.).

Plaintiff testified that he has not had a job since his release in February of 2008. (Id.). Plaintiff stated that he has looked for a job and filled out job applications with the assistance of his siblings, but he has never received a job offer. (Tr. 19-20).

Plaintiff testified that he worked for Mitch Merch Maintenance performing maintenance work in 2003. (Tr. 20). Plaintiff stated that he worked in a food court, sweeping the floor and emptying trash at this position. (Id.).

Plaintiff testified that he worked for Willow Brook Foods, Inc. in 2001 and 2002, when he was incarcerated. (Id.). Plaintiff stated that he processed turkeys at this position. (Id.). Plaintiff testified that he worked at Grandview Restaurant Inc. off and on as a dishwasher. (Tr. 21).

Plaintiff stated that he worked at RPMG performing maintenance work, such as cleaning bathrooms, for about four months. (Tr. 22).

Plaintiff testified that he is under the care of a psychiatrist for treatment of depression. (Id.). Plaintiff stated that he experiences feelings of helplessness due to being unable to work. (Id.).

Plaintiff testified that he gets tired easily, and he takes naps during the day for two to three hours.  (Id.).  Plaintiff stated that he gets up constantly during the night to urinate due to his diabetes.  (Id.).

Plaintiff testified that he experiences difficulty focusing.  (Tr. 23).

Plaintiff stated that he cries about two to three days a week.  (Id.).  Plaintiff testified that he cries because he feels bad about being unable to take care of himself and "do normal things." (Id.).

Plaintiff stated that his blood sugar levels fluctuate.  (Id.).  Plaintiff testified that he was currently on a diabetic diet.  (Id.).  Plaintiff stated that his diabetes causes him to urinate about every thirty minutes during the night.  (Tr. 24).

Plaintiff testified that he is unable to sit for long periods because he gets restless and loses concentration easily.  (Id.).

Plaintiff stated that he has problems with his feet due to his diabetes.  (Tr. 25).  Plaintiff testified that he is able to stand for one to one-and-a-half hours.  (Id.).  Plaintiff stated that he is able to walk about one block without a break.  (Id.).

Plaintiff testified that he sustained a head injury in the early 1990s.  (Id.).  Plaintiff stated that he still has effects from the head injury, such as difficulty with concentration, focus, and memory.  (Id.).  Plaintiff testified that he has a hard time remembering his birthday.  (Id.).

Plaintiff stated that he does not believe he can work a full-time job.  (Tr. 26).  Plaintiff testified that he is unable to stand for long periods and he is illiterate.  (Tr. 26).

Plaintiff testified that his roommate helps him read his mail.  (Tr. 27).  Plaintiff stated that his roommate helps him with other tasks, such as making him comfortable when his feet start

hurting during the night. (Id.).

Plaintiff stated that his siblings also help him read, and help him with other tasks if necessary. (Tr. 27). Plaintiff testified that he speaks to his siblings four to five days a week. (Id.).

Plaintiff stated that he only leaves his house to see his attorney, his case worker, his parole officer, or to get groceries. (Id.). Plaintiff testified that he does not go out more often because he experiences knee and foot pain. (Id.). Plaintiff stated that he is unable to follow a list when he goes to the grocery store. (Tr. 28).

Plaintiff testified that Linda with Options for Justice is his case worker. (Id.). Plaintiff stated that Linda helps him sign up for classes, helps him read, and arranges transportation for him. (Id.). Plaintiff testified that he meets with Linda about twice a month. (Tr. 29). Plaintiff stated that Linda comes to his home. (Id.).

Plaintiff testified that he usually wakes up between 5:30 and 7:00 a.m., eats breakfast, and goes back to sleep for five to six hours if he does not have an appointment. (Tr. 29-30). Plaintiff stated that, after napping, he tries to exercise by walking. (Id.). Plaintiff testified that he tries to walk to Fairground Park, which is six to seven blocks from his home. (Id.). Plaintiff stated that he usually cooks fast meals in the microwave, although he fries chicken about once a month. (Tr. 30). Plaintiff testified that he has no difficulty taking care of his personal hygiene. (Id.).

Plaintiff testified that his brothers come to his home to check on him and visit with him. (Tr. 31). Plaintiff stated that his daughter also visits him. (Id.).

The ALJ examined plaintiff, who testified that he used marijuana occasionally, but not on a daily basis, after 2009. (Id.). Plaintiff stated that he last used marijuana in October of 2010.

(Tr. 32).

The ALJ next examined vocational expert Michael McKeeman, who testified that plaintiff's past work is classified as follows: poultry dresser, unskilled and light; kitchen helper, unskilled and medium; and clean-up cleaner, unskilled and heavy as typically performed and medium as described by plaintiff. (Tr. 37). Mr. McKeeman stated that it was unclear whether plaintiff performed any of these positions at the substantial gainful activity level. (Id.).

The ALJ asked Mr. McKeeman to assume a hypothetical claimant with plaintiff's background and a limitation to medium work. (Id.). Mr. McKeeman testified that the individual would be able to perform plaintiff's past work as poultry dresser and kitchen helper as performed in the national economy, and would be able to perform the cleaner position as performed by plaintiff. (Id.). Mr. McKeeman stated that the individual would also be capable of performing other positions. (Tr. 38).

The ALJ next asked Mr. McKeeman to assume the additional limitation of work limited to simple routine and repetitive tasks. (Id.). Mr. McKeeman testified that the individual would still be capable of performing all of plaintiff's past work. (Id.).

The ALJ then asked Mr. McKeeman to assume the additional limitation of three or more unscheduled absences per month due to physical and mental symptoms. (Tr. 39). Mr. McKeeman testified that such an individual would be unable to hold a job. (Id.).

Plaintiff's attorney asked Mr. McKeeman to assume the following limitations: during the course of an eight-hour day, able to apply common sense understanding to carry out simple one-to-two-step instructions for a total of two hours; and able to interact appropriately with co-workers, supervisors, and the general public for a total of two hours during an eight-hour

workday.  (Tr. 39-40).  Mr. McKeeman testified that the individual would be unable to keep a job with these limitations.  (Tr. 40).

**B.**     **Relevant Medical Records**

The record reveals that plaintiff was admitted to the trauma service at Barnes-Jewish Hospital on August 11, 1991, following an assault which involved plaintiff being stomped and kicked about the head and face.  (Tr. 416).  Plaintiff had been found lying supine in the street, unresponsive.  (Id.).  Plaintiff suffered diffuse cerebral edema and scattered contusions.  (Tr. 610). Plaintiff also had a syndrome of depressed sensorium, confusion, and impaired gait.  (Id.). Plaintiff was discharged from rehabilitation on September 6, 1991, at which time he was diagnosed with closed head injury, short term memory deficit, and mild gait ataxia.[1]  (Tr. 612).

Plaintiff received medical care at the Missouri Department of Corrections ("DOC") from April 2008 through March 2009.  (Tr. 238-360).  Plaintiff was treated for diabetes mellitus,[2] and was prescribed Metformin[3] and Glyburide.[4]  (Tr. 249-50, 253-54, 283, 296, 341, 346, 354). Plaintiff was assessed with a "knowledge deficit."  (Tr. 291, 292, 296, 298, 350, 355).

---

[1]An inability to coordinate muscle activity during voluntary movement; most often results from disorders of the cerebellum or the posterior columns of the spinal cord; may involve the limbs, head, or trunk.  Stedman's Medical Dictionary, 172 (28th Ed. 2006).

[2]Diabetes mellitus is a chronic metabolic disorder in which the use of carbohydrate is impaired and that of lipid and protein is enhanced.  It is caused by an absolute or relative deficiency of insulin and is characterized, in more severe cases, by chronic hyperglycemia, water and electrolyte loss, ketoacidosis, and coma.  Stedman's at 529.

[3]Metformin is indicated to improve glycemic control in patients with type 2 diabetes.  See Physician's Desk Reference ("PDR"), 3072 (63rd Ed. 2009).

[4]Glyburide is indicated to control high blood sugar in patients with type 2 diabetes.  See WebMD, http://www.webmd.com/drugs (last visited November 25, 2013).

Plaintiff received treatment at Grace Hill Neighborhood Health Center ("Grace Hill") from September 2009, through December 2010, for treatment of diabetes, foot problems, and depression. (Tr. 361-402). On September 1, 2009, plaintiff complained of toe pain. (Tr. 361-63). It was noted that plaintiff's diabetes mellitus began in 2002. (Id.). Plaintiff was diagnosed with foot ulcers, and was referred to a podiatrist. (Id.). On February 9, 2010, plaintiff complained of foot ulcers and frequent urination. (Tr. 388). Plaintiff had been off of his diabetes medication for three months. (Id.). Plaintiff was restarted on Glyburide, and was referred to a podiatrist for debridement and evaluation. (Tr. 389). On July 14, 2010, plaintiff complained of depressed mood, diminished interest or pleasure, significant change in appetite, sleep disturbance, and thoughts of death or suicide. (Tr. 391). Plaintiff was diagnosed with depression. (Tr. 392). Plaintiff was started on Celexa,[5] and was referred to a social worker for counseling. (Id.). On October 19, 2010, plaintiff reported that his mood was good while he was taking Celexa. (Tr. 394). It was noted that plaintiff's diabetes was well-controlled. (Tr. 395). The Glyburide was stopped and plaintiff was started on Metformin. (Id.). Plaintiff's depression was well-controlled with Celexa. (Tr. 396). On November 22, 2010, it was noted that plaintiff no longer required diabetes medication as he had not taken any medication in two months and his blood sugar levels were normal. (Tr. 398). Plaintiff was again told he did not require diabetes medication on December 21, 2010. (Tr. 402).

Plaintiff saw licensed psychologist Robert E. Schlitt, Ph.D, on January 11, 2011, for a psychological evaluation at the request of plaintiff's attorney. (Tr. 373-83). Dr. Schlitt noted that plaintiff had sustained two head injuries in the past. (Tr. 374). Plaintiff reported being depressed

---

[5]Celexa is indicated for the treatment of depression. See PDR at 1161.

for seven to eight years, although he had only taken medication for four to five months. (Id.). Upon mental status exam, plaintiff was alert, oriented, and in an "up" mood. (Tr. 375). Plaintiff reported mood swings consistent with bipolar disorder. (Id.). Dr. Schlitt also noted psychosis, which made him question whether plaintiff may be developing schizoaffective disorder[6] of the bipolar type. (Id.). Dr. Schlitt indicated that plaintiff reported psychotic symptoms of seeing shadows and hearing voices that tell him to hurt himself. (Id.). Dr. Schlitt stated that plaintiff also has paranoia and significant problems with trust. (Id.). Plaintiff reported a limited past employment history, and indicated that he could not maintain a relationship with women due to his odd thought patterns. (Id.). On psychological testing, plaintiff reported symptoms consistent with moderate ADHD.[7] (Tr. 376). Dr. Schlitt administered the Wechsler Adult Intelligence Scale IV ("WAIS-IV"), which revealed a Full Scale IQ of 63. (Tr. 377). Dr. Schlitt stated that plaintiff's Full Scale IQ score is in the mental retardation range of intellectual abilities. (Id.). Dr. Schlitt noted that plaintiff's Full Scale IQ score was 73 when he was nineteen, and stated that his head injuries and possibly substance abuse issues contributed to the lower current score. (Id.). Dr. Schlitt stated that plaintiff's ability to think abstractly was lowered, and that both tests showed poor vocabulary scores, short-term memory, and arithmetic skills. (Id.). Dr. Schlitt concluded

_____

[6]An illness manifested by an enduring major depressive, manic, or mixed episode along with delusions, hallucinations, disorganized speech and behavior, and negative symptoms of schizophrenia. Stedman's at 570.

[7]A behavioral disorder manifested by developmentally inappropriate degrees of inattentiveness (short attention span, distractability, inability to complete tasks, difficulty in following directions), impulsiveness (acting without due reflection), and hyperactivity (restlessness, fidgeting, squirming, excessive loquacity). Stedman's at 568.

that plaintiff is functioning in the mild mental retardation[8] range. (Tr. 378). Dr. Schlitt diagnosed plaintiff with bipolar disorder not otherwise specified with psychosis; rule out schizoaffective disorder of the bipolar type; ADHD; poly-substance abuse (primarily marijuana and cocaine/heroin) now in remission; by history, learning disorder NOS; mild mental retardation; personality disorder with aggressive/passive aggressive and paranoid traits; and a GAF score of 41.[9] (Tr. 382-83).

Dr. Schlitt also completed a Medical Source Statement-Consultative Examination, in which he expressed the opinion that plaintiff had extreme limitations in his ability to function independently, maintain reliability, maintain socially acceptable behavior, make simple and rational decisions, maintain attention and concentration for extended periods, and perform at a consistent pace without an unreasonable number and length of breaks; marked limitations in his ability to cope with normal stress, behave in an emotionally stable manner, relate to family and peers, accept instructions or respond to criticism, ask simple questions or request assistance, sustain an ordinary routine without special supervision, and respond to changes in the work setting; and moderate limitations in his ability to adhere to basic standards of neatness and cleanliness, and interact with strangers or the general public. (Tr. 384-85). Dr. Schlitt found that plaintiff could apply commonsense understanding to carry out simple one-or-two-step instructions, and interact appropriately with coworkers, supervisors, and the general public a total of zero to two hours.

_____

[8]Mild mental retardation is characterized by an IQ score of 50-55 to approximately 70. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 40 (4th Ed. 1994). Borderline intellectual functioning is characterized by an IQ score in the 71 to 84 range. See id. at 684.

[9]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 32.

(Tr. 386).  Dr. Schlitt indicated that plaintiff would miss work three times a month or more due to psychologically-based symptoms.  (Id.).

Plaintiff saw John S. Rabun, M.D., on April 11, 2011, for a psychological evaluation at the request of the state agency.  (Tr. 707-09).  Plaintiff reported that he had been depressed for two years.  (Tr. 707).  Plaintiff indicated that he was sometimes suicidal, feels down for several days, and is irritable.  (Id.).  Plaintiff did not endorse any thoughts of hopelessness or worthlessness. (Tr. 708).  Plaintiff did not describe any psychosis or report any features of anxiety.  (Id.).  Upon mental status examination, plaintiff was pleasant and cooperative, was able to focus and concentrate on questions and respond appropriately, his flow of thought was logical and goal-directed, his affect was appropriate, his mood was "sometimes depressed," his content of thought did not reveal signs of a primary mood disorder, his memory was preserved for personal information, and his insight and judgment were both preserved.  (Id.).  Dr. Rabun stated that plaintiff's intellectual capacity is judged to be in the average range.  (Id.).  Dr. Rabun gave no diagnosis and assessed a GAF score of 70.[10]  (Id.).  Dr. Rabun stated that plaintiff has the capacity to focus, concentrate, and remember instructions; interact appropriately in a social setting; and adapt to changes in a work environment.  (Id.).

Dr. Rabun completed a Medical Source Statement of Ability to do Work-Related Activities (Mental), in which he expressed the opinion that plaintiff's ability to understand, remember, and carry out instructions; and ability to interact appropriately with supervisors, co-

---

[10]A GAF score of 61 to 70 denotes "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV at 32.

workers and the public were not affected by his impairments. (Tr. 710-11).

Plaintiff saw Raymond Leung, M.D., for an internist examination on April 11, 2011. (Tr. 691-93). Plaintiff's chief complaints were diabetes and asthma. (Tr. 691). Plaintiff was taking oral medications for diabetes. (Id.). Plaintiff smoked one-and-a-half packages of cigarettes a day and noted some wheezing and shortness of breath. (Id.). Plaintiff complained of pain in his feet, excessive thirst, and excessive urination. (Id.). Plaintiff's mini mental status examination revealed an intact memory, normal fund of knowledge, and an affect within normal limits. (Tr. 692). Upon physical examination, plaintiff had decreased breath sounds, walked with a minimal to mild limp, had full range of motion of the joints, had no difficulties getting on and off the exam table, had intact sensation to light touch and pinprick in the feet, and minimal vibratory sensation in his feet. (Tr. 693). Dr. Leung's impression was diabetes with foot pain and some possible neuropathy; and asthma. (Id.).

Dr. Leung completed a Medical Source Statement of Ability to do Work-Related Activities (Physical), in which he expressed the opinion that plaintiff could continuously lift or carry up to ten pounds, frequently lift or carry up to twenty pounds, occasionally carry up to fifty pounds and never carry more than fifty pounds. (Tr. 699). Dr. Leung found that plaintiff could sit continuously for eight hours; stand continuously for two hours and stand a total of four hours; and walk continuously for one hour, and walk a total of two hours. (Tr. 700). Dr. Leung indicated that plaintiff could operate foot controls, climb stairs and ramps, climb ladders or scaffolds, stoop, kneel, crouch, and crawl occasionally; and could balance continuously. (Tr. 701-02). Finally, Dr. Leung found that plaintiff could never be exposed to unprotected heights, operate a motor vehicle, or be exposed to dust or other pulmonary irritants; and could occasionally be exposed to moving

mechanical parts, humidity and wetness, and extreme cold or heat.  (Tr. 703).

On December 28, 2010, Starlett Grey, MSW, LCSW, completed a Mental Medical Source Statement, in which she expressed the opinion that plaintiff had extreme limitations in his ability to behave in an emotionally stable manner, maintain reliability, relate to family and peers, accept instructions or respond to criticism, maintain socially acceptable behavior, maintain attention and concentration for extended periods, perform at a consistent pace without an unreasonable number and length of breaks, sustain an ordinary routine without special supervision, and respond to changes in the work setting; and marked limitations in his ability to cope with normal stress, function independently, adhere to basic standards of neatness and cleanliness, interact with strangers or the general public, ask simple questions or request assistance, and make simple and rational decisions.  (Tr. 369-70).  Ms. Grey found that plaintiff could apply commonsense understanding to carry out simple one-or-two-step instructions a total of four hours in an eight-hour period, interact appropriately with coworkers a total of four hours, and interact appropriately with supervisors and the general public a total of zero to two hours.  (Tr. 371).  Ms. Grey indicated that plaintiff would miss work twice a month due to psychologically-based symptoms.  (Id.).  Ms. Grey stated that plaintiff has a diagnosis of major depression and is always in a guarded mode.  (Tr. 372).  Ms. Grey further stated that plaintiff is "closed and paranoid," and has "trust issues."  (Id.).

**C.**     **School Records**

Plaintiff was administered the Wechsler Intelligence Scale for Children (WISC) in 1974, which revealed a Verbal IQ score of 87, a Performance IQ score of 68, and a Full Scale IQ score of 76.  (Tr. 204).  In 1976, plaintiff obtained a Verbal IQ score of 71, Performance IQ score of 63,

and Full Scale IQ score of 68. (Id.). In 1983, plaintiff obtained a Verbal IQ score of 74, Performance IQ score of 73, and Full Scale IQ of 73. (Tr. 205). Plaintiff was described as within the "educable retarded range" and was placed in the educable mentally retarded program. (Tr. 212).

In 1986, when plaintiff was in the twelfth grade, he obtained a Verbal IQ score of 74, Performance IQ sore of 73, and Full Scale IQ score of 73. (Tr. 205). Plaintiff's teacher indicated that plaintiff had moderate problems in the areas of distractability, disruptive behavior, not following classroom rules, lacking self-confidence, being defiant, being easily confused, and daydreaming. (Id.). It was noted that plaintiff was only able to perform simple basic addition and subtraction, was basically a "non-reader," was able to recognize the letters of the alphabet, and knew 10 out of 220 sight words. (Tr. 206).

## The ALJ's Determination

The ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since October 7, 2009, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: borderline intellectual functioning and diabetes with neuropathy (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 416.967(b). Considering the claimant's borderline intellectual functioning and limited work history, the undersigned finds that he would be limited to work involving simple, routine, and repetitive tasks.

5.    The claimant has no past relevant work (20 CFR 416.965).

6.    The claimant was born on April 2, 1967 and was 42 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.    The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.   The claimant has not been under a disability, as defined in the Social Security Act, since October 7, 2009, the date the application was filed (20 CFR 416.920(g)).

(Tr. 48-56).

The ALJ's final decision reads as follows:

Based on the application for supplemental security income filed on October 7, 2009, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 56).


## Discussion

**A.    Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

**B.**     **The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must

significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age,

education and work experience of a claimant are not considered in making the "severity"

determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of

the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial

gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in

Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or

equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20

C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next

step which inquires into whether the impairment prevents the claimant from performing his or her

past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the

previous work, in consideration of the claimant's residual functional capacity (RFC) and the

physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant

cannot perform his or her previous work, the final step involves a determination of whether the

claimant is able to perform other work in the national economy taking into consideration the

claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§

404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to

perform any other work.  See id.  Throughout this process, the burden remains upon the claimant

until s/he adequately demonstrates an inability to perform previous work, at which time the burden

shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See

Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a,

416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  <u>See</u> 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work:  activities of daily living, social functioning, concentration, and persistence or pace.  <u>See</u> 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  <u>See id.</u>  Next, the Commissioner must determine the severity of the impairment based on those ratings.  <u>See</u> 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  <u>See</u> 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  <u>See id.</u>  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  <u>See</u> 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.    <u>Plaintiff's Claims</u>

Plaintiff first argues that the ALJ erred in finding that plaintiff did not meet the requirements of Listing 12.05C, the listing for mental retardation.[11]  Plaintiff next argues that the

---

[11]Plaintiff does not challenge the ALJ's findings with regard to his physical impairments.

ALJ erred in evaluating the medical opinions of record regarding plaintiff's mental impairments. Plaintiff finally contends that the ALJ's RFC determination is not supported by substantial evidence. The undersigned will discuss plaintiff's claims in turn.

"The claimant has the burden of proving that his impairment meets or equals a listing," Carlson v. Astrue, 604 F.3d 589, 593 (8th Cir. 2010); and, "'[t]o meet a listing, an impairment must meet all of the listing's specified criteria,'" id. (quoting Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004)). To satisfy Listing 12.05C, a formal diagnosis of mental retardation is not required. Christner v. Astrue, 498 F.3d 790, 793 (8th Cir. 2007); Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006). This is so because the "medical standard for mental retardation differs from the legal standard." Scott ex. rel. Scott v. Astrue, 529 F.3d 818, 824 n.4 (8th Cir. 2008).

Listing 12.05 provides as follows:

12.05 Mental Retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

    \*\*\*

B.  A valid verbal, performance, or full scale IQ of 59 or less;

OR

C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

20 C.F.R. pt. 404, subpt. P, App. 1, § 12.05.

In addition, the overall introduction to the mental disorders section states:

Listing 12.05 contains an introductory paragraph with the diagnostic description for

mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.

Id. at § 12.00.

The Eighth Circuit has held that the requirements in the introductory paragraph of Listing 12.05-the diagnostic description of mental retardation-are mandatory. Maresh, 438 F.3d at 899. Thus, in order to qualify as mentally retarded under Listing 12.05C, plaintiff was required to show: (1) significantly subaverage general intellectual functioning with deficits in adaptive functioning, (2) an onset of that impairment prior to age twenty-two, (3) a valid IQ score between 60 and 70, and (4) an additional impairment imposing a significant work-related limitation of function. See Cheatum v. Astrue, 388 Fed. Appx. 574, 576 (8th Cir. 2010) (holding that a claimant must prove deficits in adaptive functioning in addition to the elements of paragraph C); Maresh, 438 F.3d at 899.

The ALJ concluded that plaintiff did not meet Listing 12.05C because he did not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. (Tr. 49). The ALJ subsequently stated that, although plaintiff was diagnosed with mild mental retardation by Dr. Schlitt, plaintiff's "actual intellectual and adaptive functioning is actually somewhat higher than was measured in testing by him." (Tr. 53). The ALJ noted that testing administered when plaintiff was nineteen revealed a Full Scale IQ of 73, which is within the borderline intellectual functioning range. (Id.). The ALJ stated that the record does not support Dr. Schlitt's opinion that plaintiff's cognitive functioning decreased. (Id.). In support of this finding, the ALJ noted that plaintiff earned $6,960.37, his highest level of earnings, in 1992. (Id.). The ALJ stated that Dr. Rabun

estimated that plaintiff's intellectual capacity was average. (Id.). Finally, the ALJ stated that

neither Grace Hill records nor prison records note a diagnosis of a cognitive deficit. (Id.).

"'[A] person's IQ is presumed to remain stable over time in the absence of any evidence of

a change in a claimant's intellectual functioning.'" Phillips v. Colvin, 721 F.3d 623, 626 (8th Cir.

2013) (quoting Muncy v. Apfel, 247 F.3d 728, 734 (8th Cir. 2001)) (alteration in original). An

ALJ "'is not required[, however,] to accept a claimant's IQ scores . . . and may reject scores that

are inconsistent with the record.'" Miles v. Barnhart, 374 F.3d 694, 699 (8th Cir. 2004) (quoting

Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1988)) (second alteration in original). "'Indeed, test

scores of this sort should be examined to assure consistency with daily activities and behavior.'"

Id. (quoting Clark, 141 F.3d at 1255).

The undersigned finds that the ALJ erred in rejecting the opinion of Dr. Schlitt regarding

plaintiff's intellectual functioning. Plaintiff saw Dr. Schlitt, a licensed psychologist, for a

psychological evaluation, on January 11, 2011. (Tr. 373-83). Dr. Schlitt administered the

Wechsler Adult Intelligence Scale IV ("WAIS-IV"), which revealed a Full Scale IQ of 63. (Tr.

377). Dr. Schlitt acknowledged that the last time plaintiff had undergone intelligence testing, at

the age of nineteen, his Full Scale IQ was 73. (Tr. 377, 205). Dr. Schlitt expressed the opinion

that plaintiff's head injuries, and possibly his substance abuse, contributed to lowering his IQ

scores. (Tr. 377, 381). Dr. Schlitt concluded that plaintiff was functioning in the mild mental

retardation range. (Tr. 378).

The ALJ has the role of resolving conflicts among the opinions of various treating and

examining physicians. Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). The ALJ may

reject the conclusions of any medical expert, whether hired by the government or the claimant, if

they are inconsistent with the record as a whole.  Id.  Normally, the opinion of the treating physician is entitled to substantial weight.  Casey v. Astrue, 503 F.3d 687, 691 (8th Cir. 2007). The opinion of a consulting physician, who examines a claimant once, or not at all, generally receives very little weight.  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).  The opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician.  20 C.F.R. § 404.1527(d)(1).

The medical record supports Dr. Schlitt's finding that plaintiff sustained a significant head injury in August 1991.  (Tr. 416, 610, 612).  At the time of plaintiff's discharge from rehabilitation on September 6, 1991, plaintiff was diagnosed with closed head injury, short term memory deficit, and mild gait ataxia.  (Tr. 612).  Plaintiff's records from Barnes-Jewish hospital reveal that, although plaintiff made improvements during his hospitalization and rehabilitation, he continued to experience difficulty with two-step commands and abstract reasoning; and short-term memory deficit upon discharge.  (Tr. 612, 630).  The ALJ does not point to any medical evidence that contradicts Dr. Schlitt's finding of a cognitive decline resulting from plaintiff's head injury.

The ALJ pointed out that Dr. Rabun estimated that plaintiff's intellectual capacity was average, and Grace Hill providers did not diagnosis plaintiff with a cognitive deficit.  (Tr. 49, 708). Dr. Rabun, however, did not administer any cognitive testing.  Similarly, Grace Hill providers did not evaluate plaintiff for a cognitive impairment.  Dr. Rabun only performed a psychological examination to evaluate plaintiff's complaints of depression.  (Tr. 707-09).  Dr. Schlitt's opinion was based on his administration of the WAIS-IV, the administration of other psychological testing, an interview with plaintiff, and review of plaintiff's medical and educational records.  (Tr. 376). Dr. Schlitt stated that testing revealed poor ability to think abstractly, poor vocabulary scores,

poor short-term memory, and poor arithmetic skills. (Tr. 377). Although the ALJ states that plaintiff's prison records do not note a diagnosis of a cognitive deficit, plaintiff's MDOC medical records do in fact contain a diagnosis of "knowledge deficit" on multiple occasions. (Tr. 291, 292, 296, 298, 350, 355).

Plaintiff's school records also support Dr. Schlitt's finding of mild mental retardation. Plaintiff obtained IQ scores under 70 in 1974 and 1976. (Tr. 204). Plaintiff was described as within the "educable retarded range" and was placed in the educable mentally retarded program. (Tr. 212). As previously discussed, when plaintiff was nineteen and in the twelfth grade, he obtained a Verbal IQ score of 74, Performance IQ score of 73, and Full Scale IQ score of 73. (Tr. 205). Even then, however, plaintiff's teacher indicated that plaintiff had moderate problems in the areas of distractability, disruptive behavior, not following classroom rules, lacking self-confidence, being defiant, easily confused, and daydreaming. (Id.). It was noted that plaintiff was only able to perform simple basic addition and subtraction, was basically a "non-reader," was able to recognize the letters of the alphabet, and knew only 10 out of 220 sight words. (Tr. 206). The ALJ did not discuss plaintiff's school records that support Dr. Schlitt's findings regarding plaintiff's level of cognitive functioning.

Finally, the ALJ found that the fact that plaintiff was able to earn $6,960.37 in 1992 suggests he did not suffer any lingering cognitive deficit as a result of the head trauma. (Tr. 53). The ALJ provides no support for his finding that plaintiff's ability to perform work at less than the substantial gainful activity level for one year demonstrates he has no cognitive deficits. Dr. Schlitt's findings regarding plaintiff's cognitive ability are supported by Dr. Schlitt's testing, plaintiff's medical records, and his school records.

It is not enough that plaintiff has a low IQ; his deficits in adaptive behavior must have initially manifested themselves before he was 22 years old. There is support in the record for a finding that they did. Plaintiff took all special education classes, was unable to read or write, was defiant, engaged in disruptive behavior, did not follow classroom rules, was easily confused, and lacked self-confidence. (Tr. 205). In Maresh, the Eighth Circuit Court of Appeals found that the claimant had exhibited deficits in adaptive functioning at a young age when he had frequent fights with other children, had dropped out of school after the ninth grade, and could not read or write. 438 F.3d at 900. The court concluded that "the ALJ should have found that [the claimant's] impairment manifested itself during his developmental period." Id. See also Christner, 498 F.3d at 793 (finding that remand was appropriate for reconsideration of plaintiff's IQ score when plaintiff dropped out of school in sixth or eighth grade, attended special education classes, did not live independently, and was unable to read or write). Plaintiff testified that he is currently unable to read or write, lives with a roommate who reads him his mail, has never had a driver's license, rarely leaves the house, has a poor work history, and sees a caseworker twice a month who arranges transportation for him. (Tr. 16, 27, 28).

For the foregoing reasons, the ALJ's decision that plaintiff's scores did not place him in the range of Listing 12.05C is not supported by substantial evidence on the record as a whole.

Plaintiff also contends that the ALJ erred in evaluating the opinion of Starlett Grey, a licensed clinical social worker; and in determining plaintiff's RFC. On December 28, 2010, Ms. Grey completed a Mental Medical Source Statement, in which she expressed the opinion that plaintiff had either extreme or marked limitations in every area of functioning. (Tr. 369-70). Ms. Grey found that plaintiff could apply commonsense understanding to carry out simple one-or-two-

step instructions a total of four hours in an eight-hour period, interact appropriately with coworkers a total of four hours, and interact appropriately with supervisors and the general public a total of zero to two hours. (Tr. 371). Ms. Grey indicated that plaintiff would miss work twice a month due to psychologically-based symptoms. (Id.). Ms. Grey stated that plaintiff has a diagnosis of major depression and is always in a guarded mode. (Tr. 372). Ms. Grey further stated that plaintiff is "closed and paranoid," and has "trust issues." (Id.).

The ALJ assigned "very little weight" to Ms. Grey's opinions, noting that there is no evidence in the file that suggests Ms. Grey had any treating relationship with plaintiff. (Tr. 55). The ALJ also stated that, as a social worker rather than a mental health expert, Ms. Grey's opinions regarding plaintiff's functional abilities is not entitled to special weight, especially when it is inconsistent with other evidence. (Id.).

It is true that Ms. Grey, as a social worker, is not an acceptable medical source. See 20 C.F.R. §§ 404.1513(a), 461.913(a). Consequently, she cannot be considered as treating a source and may not render medical opinions. See 20 C.F.R. §§ 404.1527(a)(2), 404.1527(d), 416.927(a)(2), and 416.927(d). Ms. Grey can, however, and should be, considered as an "other source." Social Security Ruling 06-3p, 2006 WL 2329939, *2 (S.S.A. Aug. 9, 2006). Thus, Ms. Grey's observations and opinions about plaintiff should be examined within the framework of the nature and extent of her relationship with plaintiff, her area of speciality or expertise, the degree to which her opinions are supported by the evidence, and "any other factors that tend to support or refute the opinion." Id. at *5.

As noted by ALJ, there is no evidence of Ms. Grey's treating relationship with plaintiff. The record contains no treatment notes from Ms. Grey, and Ms. Grey does not indicate whether

she examined plaintiff.

Independent of the claimant's burden at any step of the analysis, and regardless of whether the claimant is represented by counsel, the ALJ has an established duty to develop a full and fair record, because a hearing before an ALJ is deemed a non-adversarial proceeding. Wilcutts v. Apfel, 143 F.3d 1134, 1137-38 (8th Cir. 1998). When additional evidence might alter the outcome of a disability determination, the ALJ has a duty to elicit such evidence. Id. This duty may include seeking additional evidence or clarification from treating physicians if portions of the medical record that are crucial to the plaintiff's claim are illegible. Snead v. Barnhart, 360 F.3d 834, 838-39 (8th Cir. 2004). "[R]eversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial." Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995).

Ms. Grey's opinion that plaintiff has marked and extreme limitations is consistent with Dr. Schlitt's opinion. The record reveals that plaintiff was diagnosed with depression, and was referred to a social worker for counseling by a Grace Hill provider in July 2010. (Tr. 391). There are no records, however, from a social worker. The only other medical evidence regarding plaintiff's mental limitations is from a consulting psychologist who examined plaintiff on only one occasion. Thus, the undersigned finds that the ALJ erred in failing to develop the record regarding Ms. Grey's opinion. The ALJ's RFC assessment did not properly take into consideration the opinions of Dr. Schlitt or Ms. Grey and is therefore not supported by substantial evidence.

Accordingly, the undersigned recommends that this matter be reversed and remanded to the ALJ so that the ALJ can accord the proper weight to Dr. Schlitt's opinion and determine whether plaintiff meets the requirements of Listing 12.05C. The ALJ should also further develop the record by contacting Ms. Grey to obtain clarification regarding her treatment relationship with

plaintiff, and to obtain any treatment notes.  If the ALJ finds that plaintiff does not meet Listing 12.05C, the ALJ should determine a new RFC that is based on the evidence of record, and proceed with the sequential evaluation.

<u>**RECOMMENDATION**</u>

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this 15th  day of January, 2014.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE